NEW YORK LIFE INS. CO. v. MOATS. †

(Circuit Court of Appeals, Ninth Circuit. August 4, 1913.)

No. 2,228.

1. INSURANCE (§ 256*)—AVOIDANCE FOR MISREPRESENTATION—HEALTH OF INSURED—EFFECT OF MEDICAL EXAMINATION.

Where the medical examiner of an insurance company was required to examine an applicant to see if he was suffering from certain named diseases, and also to report very fully to the company all matters observed by him, so as to give the home office a pen picture of the applicant as he presented himself to the examiner, the risk was determined by the company mainly upon such examination, and not upon the answers made by the applicant to the medical examiner as to his physical condition.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 540, 549; Dec. Dig. § 256.*]

2. INSURANCE (§ 668*)—ACTIONS ON POLICIES—SUFFICIENCY OF EVIDENCE—MISREPRESENTATIONS AS TO HEALTH.

In an action on a life insurance policy, evidence *held* not to show by uncontradicted testimony that the insured knowingly made false and fraudulent answers to the medical examiner, and therefore to require the submission of that question to the jury.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1556, 1732–1770; Dec. Dig. § 668.*]

3. INSURANCE (§ 265*)—AVOIDANCE OF POLICY—DISTINCTION BETWEEN WARRANTY AN REPRESENTATION.

Answers to questions concerning previous diseases of an applicant for insurance were under the facts of this case representations and not warranties, and nothing more is required of him than that he answer in good faith.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 560; Dec. Dig. § 265.*]

4. INSURANCE (§ 668*) — ACTIONS ON POLICIES — SUFFICIENCY OF EVIDENCE — MISREPRESENTATIONS AS TO MEDICAL ATTENDANCE.

In an action upon a life insurance policy, evidence *held* to raise a question for the jury whether representations by insured in his application that he had consulted a physician concerning himself only once in five years were false.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1556, 1732–1770; Dec. Dig. § 668.*]

5. INSURANCE (§ 669*)—ACTIONS ON POLICY—INSTRUCTIONS—MEDICAL ATTENDANCE.

In such a case, an instruction that consulting a physician about some slight immaterial ailment would not necessarily make a statement that he had not consulted one fraudulent was correct.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1556, 1771–1784; Dec. Dig. § 669.*]

6. INSURANCE (§ 136*)—DELIVERY OF POLICY—CHANGE OF HEALTH.

Where an application for a life insurance policy stipulated that it should not take effect until the premium was paid and the policy delivered, but then it should relate back to the date of the application, and the policy provided that it should take effect as of the date of the application, upon payment of the premium and delivery, and neither the application nor the policy contained a provision that the insured should be in sound health when the policy was delivered, the fact that insured

did not, of his own volition, without inquiry from the company, inform it when the policy was delivered that he had been confined in a sanitarium since his application was made was not a fraud upon the company which would vitiate the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 219–230; Dec. Dig. § 136.*]

7. INSURANCE (§ 136*)—DELIVERY OF POLICY—CHANGE OF HEALTH.

A change in the health of insured under such policy between the time of the application and the receipt of the policy did not avoid the policy, since the company had assumed the risk for that time, and had been paid therefor.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 219–230; Dec. Dig. § 136.*]

8. INSURANCE (§ 304*) — AVOIDANCE FOR MISREPRESENTATION — CONTINUING REPRESENTATIONS.

Representations made by an applicant for life insurance as to his good health are not continuing representations covering the period between the date of the application and the delivery of the policy, where the policy does not provide that the insured shall be in good health at the date of delivery.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 698; Dec. Dig. § 304.*]

In Error to the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Consolidated actions by Ida M. Moats, individually, and as guardian of George A. Moats, against the New York Life Insurance Company. Judgment for plaintiffs, in each action, and defendant brings error. Affirmed.

On the 16th day of March, 1911, George S. Moats, husband of the defendant in error, Ida M. Moats, and father of the minor, George A. Moats, made application to the New York Life Insurance Company for two policies of insurance on his life, in the sum of $5,000 each; one in favor of George A. Moats, the minor son, and the other in favor of Ida M. Moats, the wife of the insured. In and by the applications it was provided that the insurance thereby applied for should not take effect unless the first premium was paid, and the policies delivered to and received by the applicant during his lifetime, and that, unless otherwise agreed in writing, the policies should then relate back to and take effect as of the date of the applications. The first premium on the two policies was paid on the 16th day of March, 1911. On or about the 6th day of April, 1911, and during the lifetime of the applicant, the policies of insurance were delivered to and received by him; the policies being executed by the company and dated March 25, 1911. In and by the policies of insurance thus issued, the insurance company agreed to pay to George A. Moats, son of the insured, and to Ida M. Moats, the wife of the insured, the beneficiaries named therein, the sum of $5,000 each, upon receipt at the home office of the company of due proof of the death of the insured, George S. Moats, during the continuance of the contract. The contracts of insurance were made in consideration of the first premium of $134.15 on each policy (receipt of which was acknowledged in each policy), constituting payment for the period terminating on the 16th day of March, 1912, and the payment of a like sum on each policy on the last-mentioned date, and on the 16th day of March in every year thereafter during the continuance of the policy, and until the death of the insured. The policies also provided that after their delivery to the insured, they should take effect as of the 16th day of March, 1911, that being the date of the applications made by the insured, and the date of the payment of the first premium on each policy. On the 14th day of June, 1911, the insured, George S. Moats, died, and on or about the 15th

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

day of July, 1911, due proof of his death was received by the insurance company, at its home office in the city and state of New York.

As the two cases are alike in all material matters, and present the same issues for determination, and were consolidated for trial, the further statement and discussion will be with respect to the case of Ida M. Moats, guardian of the person and estate of George A. Moats, a minor.

On the 25th day of August, 1911, the insurance company undertook to rescind the contract of insurance, and refused to pay the amount alleged to be due thereunder; the rescission and refusal being based on the following grounds:

(1) That at the time of making application for the policy of insurance set forth in the complaint, and on the same day, to wit, the 16th day of March, 1911, the applicant, George S. Moats, appeared before one Dr. H. L. Underwood, the medical examiner of the insurance company, and that at that time, in response to certain questions asked the applicant by the medical examiner, the applicant made false and fraudulent answers and representations, that such false and fraudulent answers and representations were made for the purpose of deceiving the defendant, and that the policy of insurance executed by the insurance company to the insured was executed in reliance upon such fraudulent and false answers and representations.

(2) That subsequent to the making of the application for insurance, pending negotiations therefor, and prior to delivery to the insured of the policy, the applicant, George S. Moats, became insane, and his physical health irreparably impaired, which facts had been concealed from the insurance company.

On the 20th day of June, 1911, the defendant in error, Ida M. Moats, was appointed guardian of the minor, George A. Moats, and ever since that time has been, and at the time of the commencement of this suit was, the duly appointed, qualified, and acting guardian of said minor, and as such guardian instituted this action to enforce payment of the amount alleged to be due and owing to said minor, under and by virtue of the contract of insurance contained in the policy of insurance set forth in the complaint.

The suit was instituted, and the complaint filed, in the circuit court of the state of Oregon, in and for the county of Union. Upon petition of the defendant, the cause was subsequently removed for trial to the Circuit Court of the United States for the District of Oregon. The case was tried before a jury. At the close of the evidence the defendant moved for a directed verdict in its favor, which motion was based upon the following grounds: That no evidence had been introduced by the plaintiff sufficient to support a verdict in her favor; that the uncontradicted evidence in the case established the fact that the insured consulted physicians prior to March 16, 1911; that it affirmatively appeared from the evidence that the beneficiary had knowledge of these consultations; that the uncontradicted evidence in the case showed that the representations which were made were material to the risk, and that the application would not have been accepted by the defendant had the truth regarding such representations been made known to the company; that the uncontradicted evidence in the case established the fact that the beneficiary accepted the policy after the insured had been committed to the sanitarium conducted for mental and nervous diseases; and that the uncontradicted evidence in the case established the fact that on the date of his confinement to the sanitarium, the insured was insane. The motion for a directed verdict was denied. The jury returned a verdict in favor of the plaintiff in the sum of $5,000, and judgment was entered against the defendant and in favor of the plaintiff for that amount. The defendant thereupon moved the court for judgment against the plaintiff, and in favor of the defendant, non obstante veredicto, upon the ground that it appeared from the uncontradicted evidence upon the trial of the case that the alleged policy of insurance, introduced in evidence by the plaintiff, was not delivered to the insured, his beneficiary or agent, until the 6th day of April, 1911; that it further appeared from the uncontradicted evidence introduced upon the trial of the case that the insured was, on the 21st day of March, 1911, confined in a sanitarium, and was, at the time of such confinement, insane; and that it further appeared from the

uncontradicted evidence introduced upon the trial of the case that the policy of insurance was not to take effect until the date of delivery. The motion for judgment non obstante veredicto was also denied. From the judgment entered upon the verdict of the jury the defendant prosecutes this writ of error.

Platt & Platt and Hugh Montgomery, all of Portland, Or., for plaintiff in error.

C. E. Cochran, of Portland, Or., and Geo. T. Cochran, of La Grande, Or., for defendant in error.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

MORROW, Circuit Judge (after stating the facts as above). The defendant denies its liability on the two insurance policies for $5,000 each, issued to the plaintiffs as beneficiaries, on the life of George S. Moats, on two grounds:

(1) It is charged in defendant's answer that at the time of making application for such insurance, George S. Moats, the insured, made false and fraudulent answers and representations to two certain questions asked him by Dr. H. L. Underwood, the medical examiner of the insurance company, such answers and representations being material to the risk, and known to be false and fraudulent by both the insured and the beneficiaries. The two questions and answers charged to have been false and fraudulent were preceded by the following general question:

"9. Have you ever had or suffered from any of the following diseases? Answer 'Yes' or 'No' to each part of this query below. (Give explicit answers and particulars in each case—the medical examiner should satisfy himself that the applicant gives full and careful answers to this question).

" 'Yes' or 'No'; name of disease; No. of attacks; date; duration; severity; results.

"(First question). A. Of the brain or nervous system?
"Ans. No.  *  *  *

"(Second question). 11. A. Have you been under the care of or consulted a physician concerning yourself for any cause within five years?
"A. Once 3 yrs. ago.

"B. If so, for what ailment; name and address of physician?
"Ans. A pain in the back.  N. Molitor, La Grande."

If either of these answers was false and fraudulent, it may be assumed that the insurance company had no knowledge of their false and fraudulent character at the time of the delivery of the policies of insurance, and that the answers were material to the risk.

(2) It is also alleged in defendant's answer that the policies of insurance were not to take effect until delivery to the applicant; that subsequent to making application for the policies of insurance on the 16th day of March, 1911, and prior to their delivery to the applicant on April 6, 1911, and pending negotiations for a contract of insurance, the applicant became insane; that the insurance company had no knowledge of any change in the physical or mental condition or health of the applicant at the time of the delivery of the policies; that a knowledge of such change in the physical or mental condition and health of the applicant was material to the risk, and had the insurance

company known of such change, it would not have made, executed, and delivered its policies to the applicant.

[1] With respect to the defendant's denial of liability on the ground of alleged false and fraudulent answers to the questions asked by the medical examiner of the company, it will be noticed that in the first general question, as to whether the applicant had suffered from certain mentioned diseases, there is the parenthetical instruction to the medical examiner that he should satisfy himself that the applicant gives full and careful answers to the questions, and in pursuance of this instruction the medical examiner is required to make an examination of the applicant and an independent report to the home office as to his physical condition, and whether the applicant has given full and true information in all respects. Such a report was made out by Dr. Underwood, the medical examiner in this case, and was transmitted to the home office of the insurance company, with the application. In this report the medical examiner was required to answer:

"Do you find after careful inquiry and physical examination, any evidence of past or present diseases (if so give full details)."

Then followed the direct and specific question (previously asked the applicant): "Of the brain or nervous system," to which the medical examiner replied, "No." Then followed a number of questions relating to certain signs and symptoms of disease, from which the skilled physician and examiner would be able to make a diagnosis of the applicant's condition of health, or lack of it. These signs and symptoms, as reported by the medical examiner, appeared to have been satisfactory. But in addition to this report in detail, the medical examiner was required to state whether there was anything about the applicant's character, residence, mode of life, or occupation, which would render the risk in any way undesirable. His answer to this question was, "No." He was further required to state whether he had reviewed all of the answers in his report, and also to state whether he was sure they were clear and complete. His answer to this question was, "Yes." He was further required to report:

"Do you believe that the applicant has given full and true information in all respects?"

His answer to this question was, "Yes." He was further requested to send direct to the home office of the company any information which for any reason he preferred not to embody in his report; that every endeavor should be made by the examiner to make his report as complete and precise as possible, the object being to give the home office a pen picture of the applicant as he presented himself to the examiner; and, if in addition the examiner knew of any fact or had any impression not expressed in the preceding part of his report that in his judgment would probably influence the home office in its estimate of the risk, he was required to note it under the head of "additional remarks." Nothing appeared in the report under that head; from which it may be inferred that the medical examiner, after having made a careful examination of the applicant, as a representative of the company skilled in the detection of disorder, found no sign or evidence of derangement of the brain or nervous system; that nothing

in the appearance, speech, or manner of the applicant gave to the medical examiner any impression not before expressed in his report, or which might influence the home office in its estimate of the risk. In other words, he had, as an expert representative of the company, and as required by his instructions, given in his report a pen picture of the applicant as he presented himself to the examiner, and this pen picture was favorable to the applicant as an insurable risk.

It was plainly upon the examination and report of this skilled expert of the company that the character of the risk was finally and mainly determined by the company, and not wholly upon the answers and representations of the applicant himself; and particularly must this be so where the inquiry relates to the brain or nervous system of the applicant, wherein a physician and skilled examiner and observer is often a better judge of the physical and mental condition of the applicant than the applicant himself. Dr. Underwood, the medical examiner, whose report we are now considering, was called as a witness in behalf of the defendant, and testified on cross-examination, among other things, that from his examination of the applicant, and the conversation which he had with him, he found nothing out of the normal. He found him a good risk so far as the examination revealed his condition. He had no ailment that the witness detected, and the witness was there as the representative of the company to find out if there was anything. The competency of this witness to so testify was not questioned.

[2] It appears from the evidence that on March 21, 1911, or five days after George M. Moats had made application for insurance, he was admitted to a sanitarium for treatment for a nervous condition; that he remained in the sanitarium until March 27, 1911; that he returned to the sanitarium on April 11, 1911, and on April 18, 1911, was removed to an insane asylum, where he remained until May 2, 1911, when he was discharged cured; that he was again committed to the asylum on June 4, 1911, and on June 14, 1911, he died. The type of insanity which the deceased had was designated by Dr. Tamiesie, the attending physician, and a witness on behalf of the defendant, as maniacal depressive insanity. This witness was of the opinion that the deceased was insane on and prior to March 16, 1911. Dr. Nicholas Molitor, a witness for the defendant, saw the deceased on March 3, 1911, and again on March 14, 1911. He was of the opinion that the deceased was at that time suffering from neurasthenia, but would not say that it was at that time an incipient form of insanity. Dr. James W. Laughlin, a witness for the defendant, testified that he saw the deceased on March 16, 1911 (we shall see later that there is a dispute as to this date), and again on March 20, 1911; that the deceased was in a highly nervous condition, which, upon inquiry, the witness associated with a religious revival, and the witness was of the opinion that the condition of the deceased when he saw him was a form of dementia. Dr. Charles Henry Upton, a witness on behalf of the defendant, testified that he saw the deceased in the early part of the year 1911; that he complained of nervousness and sleeplessness; that the witness was of the opinion that it was a case of neuras-

thenia. The witness was informed of the medical examination on March 16, 1911, and was asked if there later developed a mental condition of the applicant which required him to be confined in the asylum; was it possible that such condition might have sprung up after March 16, 1911? The witness answered in the affirmative, and stated that mania could occur in a very short time; that a person might become a raving maniac inside of 24 hours without any previous lesion noticeable; that the fact that the applicant was confined in an insane asylum on the 18th of April, 1911, would not necessarily be positive proof that any maniacal condition existed earlier. Upon being asked a hypothetical question, stating the various stages of the deceased's condition culminating in his death, he was asked if it was possible, under such a state of facts, for the mental condition of the deceased to have begun, developed, and culminated subsequent to March 16, 1911. His answer was in the affirmative. Dr. W. T. Williamson, a witness for the defendant, who conducted the sanitarium where the deceased was at first treated, testified that probably the neurasthenia which the deceased had on March 16, 1911, was an incipient form of the insanity from which he died; but on cross-examination, in answer to a hypothetical question stating the various stages of the deceased's condition, the witness stated that the cause of insanity could have happened after March 16, 1911. Dr. George W. Zimmerman, an osteopathist, a witness on behalf of the defendant, testified that the deceased came to him on March 18, 1911, and consulted him as to his physical condition; that the deceased said he was very nervous and could not sleep, and wanted a general physical examination to see if any cause could be found for his sleeplessness and nervousness. The witness found the deceased suffering from neurasthenia, and was of the opinion that this condition was a growth lasting over a considerable period of time. William R. Chattin, a neighbor and an intimate acquaintance of the deceased, testified on behalf of the plaintiff that the deceased was a very stout-looking man, and was gentlemanly in his conduct and upright in every respect so far as the witness could see or learn in regard to him; that the deceased was superintendent of a Sunday school, and on Sunday, March 12, 1911, he was present at the school and was all right. The witness testified that the general reputation and character of the deceased in the community where he lived was good. Other friends and neighbors testified to the same effect.

[3] We do not think that this evidence established the defense, by uncontradicted testimony, that the deceased made false and fraudulent answers to the inquiry whether he had suffered from a disease of the brain or nervous system, and that the deceased knew at the time that such answers were false and fraudulent. We think the condition of the deceased on the day he made application for insurance, and his knowledge of his own condition on that day, were questions of fact for the jury, and were properly submitted to the jury for determination. The answer to the question was a representation, and not a warranty, and nothing more was required of the applicant than good faith.

As said by the Supreme Court of the United States in Moulor v. American Life Insurance Co., 111 U. S. 335, 343, 4 Sup. Ct. 466, 470 (28 L. Ed. 447):

"Looking into the application upon the faith of which the policy was issued and accepted, we find much justifying the conclusion that the company did not require the insured to do more, when applying for insurance, than observe the utmost good faith, and deal fairly and honestly with it, in respect of all material facts about which inquiry is made, and as to which he had or should be presumed to have knowledge or information. * * * If it be said that an individual could not be afflicted with the diseases specified in the application, without being cognizant of the fact, the answer is that the jury would, in that case, have no serious difficulty in finding that he had failed to communicate to the company what he knew or should have known was material to the risk, and that, consequently, for the want of 'fair and true answers,' the policy was, by its terms, null and void. But, whether a disease is of such a character that its existence must have been known to the individual afflicted with it, and, therefore, whether an answer denying its existence was or not a fair and true answer, is a matter which should have been submitted to the jury."

[4] With respect to the question, "Have you been under the care of or consulted a physician concerning yourself for any cause within five years?" and the answer thereto, "Once three years ago," and the further question, "If so, for what ailment; name and address of physician?" and the answer thereto, "A pain in the back. N. Molitor, La Grande"—the defendant introduced the testimony of several physicians, whom it was alleged the deceased had consulted for a disease of the nerves within five years prior to the date of the application for insurance. Dr. Nicholas Molitor testified that the deceased came to the office of the witness, with his wife, on March 3, 1911; that on that occasion Mrs. Moats had come to consult him; that at that time the doctor also had a conversation with the deceased; that he believed the consultation that was paid for was the consultation for Mrs. Moats, and that the other was only incidental; that he had made a short examination of the deceased at that time; that as near as the witness could remember the deceased had on that occasion complained of restlessness and weakness; that he thought he at that time prescribed some remedy for restlessness, or told him what to do; that he was then satisfied in his own mind that the deceased was at that time suffering from neurasthenia; that he thought he had advised the deceased not to work so hard, and to make a change and take a rest. Dr. Molitor also testified that both Mrs. Moats and the deceased were at his office on the 14th day of March, 1911, but did not remember that the deceased had consulted him particularly at that time; that he and the deceased had just had an ordinary conversation; that he could not recall the character of that conversation; that the deceased had made no statement to him at that time regarding his physical condition; but that he was of the opinion at that time that the deceased was then suffering from neurasthenia, or that he was suffering from overwork of some kind. On cross-examination this witness testified that he gave very little attention to the condition of the deceased, and that the real consultation as he recalled it was for Mrs. Moats.

Dr. James W. Laughlin testified that on March 16, 1911, between 10 and 11 o'clock in the morning, the deceased came to consult him about his condition; that his wife came with him; that the deceased told him that he was suffering from sleeplessness, and that he was nervous and did not feel good generally; that he examined him and found that his physical condition appeared to be all right, but discovered that he was in a highly nervous state, and had been taking part in a religious revival and was unduly excited; that he had advised him to take a trip to Portland; and that he gave him a nerve sedative.

Dr. Charles Henry Upton testified that the deceased had called to see him some time during the spring of 1911; that he had made no record of the consultation and could not recall the exact date; that he could not recall whether it was before or after the 16th day of March; that the deceased was accompanied by his wife; that he had on that occasion complained of nervousness and sleeplessness; that he examined him and advised him to go to a lower altitude and consult a physician there; that he at that time had considered it a case of neurasthenia.

The two visits to Dr. Molitor, the first on the 3d of March, 1911, and the second on the 14th of March, 1911, the visit to Dr. Laughlin on the morning of the 16th of March, 1911, and the visit to Dr. Upton some time in the spring of 1911, are the only instances in which it is claimed that the deceased consulted physicians, at any time within five years prior to the date of his application for insurance, with the exception of a former visit to Dr. Molitor about three years before that time, which visit was admitted and set forth in the medical statement signed by the deceased at the time of applying for insurance.

It is contended by the insurance company that the deceased consulted the physicians above named within five years prior to applying for insurance, that such consultations were for a disease of the brain or nerves, and that the statements, answers, and representations made by him at the time of applying for insurance, to the effect that except on one occasion he had not consulted a physician for any cause whatever, within five years prior to the date of the application, and that he had never been treated for any disease of the brain or nerves, amounted to a deception and a fraud upon the insurance company.

But there was a material conflict as to whether the deceased did, in fact, consult either Dr. Molitor or Dr. Upton, except as admitted with respect to Dr. Molitor. Concerning the two alleged consultations of the deceased with Dr. Molitor, at which the latter testified that Mrs. Moats was present, she testified that some time in the spring of 1911, the exact date of which she could not remember, she had gone to consult Dr. Molitor, and that the deceased had gone with her; that he had not gone to consult the doctor concerning himself; that the only conversation between Dr. Molitor and the deceased on that occasion was that Dr. Molitor said something about his stomach being out of order; that that was the only time the deceased had seen Dr. Molitor in her presence, except once about three years before that time, when he had consulted Dr. Molitor for a pain across his back.

Concerning the alleged consultation with Dr. Upton, at which consultation Dr. Upton testified that Mrs. Moats was present, and which took place some time in the spring of 1911, Mrs. Moats testified that she and the deceased had called upon Dr. Upton on the same day that she had consulted Dr. Molitor; that she had heard that Dr. Upton was an eye specialist; that the deceased had been having trouble with one of his eyes for about a week or two; that Dr. Upton had on that occasion removed a lump from the eye of the deceased; that no mention was made on that occasion of sleeplessness, or about her husband's condition; that the doctor did not examine the deceased, and did not speak of nervousness; and that that was the only occasion on which they had ever called upon Dr. Upton.

Concerning the alleged consultation with Dr. Laughlin, on the morning of March 16, 1911, at which consultation Dr. Laughlin testified that Mrs. Moats was present, she testified that she and the deceased had not visited Dr. Laughlin on that date; that they had visited him one day some time after that date; that she thought that the date on which she and the deceased had called on Dr. Laughlin was March 21, 1911.

[5] Whether the applicant had in fact been under the care of or had consulted a physician concerning himself for any cause within five years other than as stated in the application was clearly a question of fact for the jury to determine, and this question was submitted to the jury by the court in a clear and appropriate instruction as follows:

"Now, then, I do not understand that consulting a physician about some slight ailment or indisposition—failure of an applicant, for insurance, to state that he had consulted a physician about some slight or immaterial ailment—would be necessarily a fraudulent statement within the meaning of this policy, but it must be something substantial, something of some import or serious character. It is the duty of an applicant to be honest, fair, conscientious, state the facts as he understands them, so that the company may determine for itself whether it will issue the policy or not. These are proper questions of fact for you to determine from the testimony in the case."

[6] The remaining question relates to the date when the policies of insurance took effect. The defendant contends that they did not take effect until their delivery to the applicant, and that subsequent to making application for insurance on March 16, 1911, and prior to the delivery of the policies to him on April 6, 1911, there occurred a change in the physical and mental health and condition of the applicant, which change was not communicated to the insurance company; that a knowledge of such change in the physical and mental condition and health of the applicant was material to the risk. The evidence on this point was to the effect that, subsequent to making application for insurance, and on the 21st day of March, 1911, the deceased was committed to the Mountain View Sanitarium, at Portland, Or.; that he was treated at the sanitarium for a disease of the nerves; that he was confined there for six days, at the end of which time he was discharged from the sanitarium; that on April 11, 1911, he was again committed to the Mountain View Sanitarium; that he remained there on that occasion for seven days, during which time he was treated for a disease of the nerves; that at the end of that period he was again

discharged; that on April 18, 1911, he was committed to the Oregon State Insane Asylum, at which time, upon examination, he was found to be insane; that he was discharged from the Oregon State Insane Asylum some time later, at which time he was recorded on the books of the asylum as having fully recovered his mental health; that on the 4th day of June, 1911, he was again committed to the Oregon State Insane Asylum; that his condition on the last-mentioned date was almost a reduplication of his condition at the time he was first committed to the asylum, on April 18, 1911, with the exception that the symptoms appeared to be more intense; that he died in the Oregon State Insane Asylum on June 14, 1911. The policy of insurance, dated March 25, 1911, was mailed from the home office of the insurance company, in New York City, to its agent, in La Grande, Or., on the 27th day of March, 1911, and was delivered to the insured on April 6, 1911. The second confinement of the deceased in the Mountain View Sanitarium and the two confinements in the Oregon State Insane Asylum have no bearing upon the question under consideration, for the reason that these confinements occurred subsequent to the delivery to and receipt by the deceased of the policy of insurance.

It is not contended that there were any false representations made by the deceased at any time after applying for insurance and before receipt of the policy by him, nor is it contended that there were any affirmative acts of deception on his part. But it is contended that the failure of the deceased to inform the insurance company, or its agent, at the time of the delivery of the policy to him, that he had been confined in the Mountain View Sanitarium between the dates of March 21, and March 27, 1911, amounted to a deception and a fraud upon the insurance company.

The only conditions subsequent stipulated in the application signed by the deceased, concerning the delivery of the policy, were that the first premium be paid and the policy delivered to and received by the deceased during his lifetime, and that the policy when so delivered should then relate back to and take effect as of the date of the application. And in the policy itself it was expressly provided that after its delivery to the deceased it should take effect as of the 16th day of March, 1911. There was no proviso, in either the application or the policy itself, that the policy should take effect only if delivered to and received by the deceased during good health and insurable condition, although, in fact, at the time of receipt of the policy by the deceased he was apparently in good health and physical condition, having been discharged from the Mountain View Sanitarium about 10 days prior to that time.

The first year's premium had been paid by the deceased at the time of making application for insurance on March 16, 1911. The premium, amounting in each case to the sum of $134.15, was the amount of the first premium provided for in each policy, and constituted payment for the period of one year, from March 16, 1911, to March 16, 1912. All the time subsequent to making application for insurance and payment of the first year's premium, up to the time of the death of the deceased, was part of the period covered by that premium, which was the payment for the risk assumed during that period.

How, then, can it be seriously contended that, because the deceased did not inform the insurance company that he had been confined in a sanitarium for a disease of the nerves for six days after making application for insurance, and. prior to delivery of the policy by the agent of the company to him, he thereby perpetrated such fraud and deception upon the company as would vitiate the policy? The company had been paid by the deceased for the risk which it assumed during that period. Subsequent to the making of application for insurance by the deceased, and up to and including the day on which the policy was delivered to the deceased by the agent of the company, neither the agent nor the insurance company made any inquiry concerning the condition of the health of the deceased; nor did either of them make any inquiry as to whether there had been any change in his physical condition subsequent to making application for insurance. But the contention of the insurance company is that it was incumbent upon the deceased, of his own volition, and without inquiry on their part, to inform it, before accepting the policy of insurance, that he had been confined six days in a sanitarium for a disease of the nerves, subsequent to making application to the insurance company for the insurance covered by the policy.

·[7] The express proviso in the application that upon payment of the first premium, and upon delivery to and receipt by the deceased of the policy during his lifetime, the policy should then relate back to and take effect as of the 16th day of March, 1911, and the express proviso in the policy itself that upon such delivery and receipt it should take effect as of the 16th day of March, 1911, are sufficient to firmly establish the terms of the contract that, those conditions being complied with, it was the intention of the parties that the policy was to take effect as of the 16th day of March, 1911. A change in the health of the insured, in the absence of any proviso in the policy, or in the application therefor, that such change would avoid the policy, cannot vitiate it, nor divest the beneficiary of his rights thereunder. That risk was one which the company had assumed by its contract, and for which it had been paid in the first premium.

[8] Nor can we agree with counsel for the insurance company that the representations contained in the application for insurance were continuing representations, and were intended to cover the period between the date of the application and the date of the delivery to and receipt by the deceased of the policy. We think that the doctrine of continuing representations is eliminated from this case by the express provisos contained in the application for insurance, and in the policy, that upon payment of the first premium, and upon delivery to and receipt by the deceased of the policy during his lifetime, the policy should then relate back to and take effect as of the date of the application.

The case of Cable v. United States Life Insurance Company, 111 Fed. 19, 49 C. C. A. 216, relied upon by counsel for the insurance company in support of the doctrine of continuing representations, and which the insurance company asserts is decisive of the issues in this case, is very different from the case at bar. In that case the policy of insurance provided that it should take effect only upon payment

of the first premium and delivery of the policy during the lifetime, sound health, and insurable condition of the applicant; and the court accordingly held that, if there had been a change in the health of the applicant between the date of the application and the date of delivery of the policy, the company was entitled to know of it, and to be fully informed concerning it, that it might determine whether, notwithstanding such change, it would consummate the agreement and deliver its policy.

The case of Equitable Life Assurance Society v. McElroy, 83 Fed. 631, 28 C. C. A. 365, to which we are referred by counsel for the insurance company. also presents an entirely different state of facts from those contained in the present case. In that case the insured, McElroy, had allowed a policy of insurance to lapse and be forfeited on account of nonpayment of premium. Subsequently negotiations were had between him and the society with a view of securing reinsurance; and during these negotiations he became seriously ill with appendicitis. On the morning of June 28, 1894, the surgeons decided that his situation was grave. and that an operation offered the only chance for recovery. McElroy then called his secretary to his room, delivered to her some blank checks signed by him, and told her to get the policy of insurance from the society and to pay the premium therefor, but not to tell the officers of the society that he was ill. With full knowledge of McElroy's serious illness, and that he was about to be operated on, his secretary went to the offices of the society, told the employés with whom she talked that her employer, McElroy, was away on business, paid the premium on the insurance policy, and secured the policy. The testimony showed that McElroy was dead at the time the policy was delivered to his secretary, although she was not aware of this fact. The basis of the court's decision in that case was that the evidence was undisputed, and that it seemed to show that there was no contract to insure, and no intention to make any such contract, until the premium was paid. The court, therefore, held that the failure of the insured, or of his secretary. to disclose to the society the condition of his health at the time of the payment of the premium by and delivery of the policy to the secretary was a fraud upon the society which vitiated the contract of insurance.

That the doctrine of continuing representations is inapplicable to the facts as disclosed in this case is fully sustained by the decision of the Supreme Court of the United States in the case of Insurance Co. v. Higginbotham, 95 U. S. 380, 383, 24 L. Ed. 499. The facts in that case were very similar to those in the case now before the court. The policy in that case was for life, and was dated the 16th day of July, 1869. It stipulated for the payment of the annual premium on or before 12 o'clock on the 16th day of July in every year, and provided that in case the premium should not be paid at the times mentioned, the policy should cease and determine. The first premium was duly paid, but when the next premium became due, on July 16, 1870, it was not paid, and the policy lapsed. In the following October the insured made application to the company for reinstatement of the policy, and the company agreed to reinstate it upon the conditions and in the man-

ner following: On the 1st of October, 1870, the insured, Dr. Day, paid the premium to the agent of the company, and received a receipt for the same. At that time he gave to the agent his certificate of health, and the physician of the company signed his certificate of examination, which was forwarded to the home office of the company. The policy was renewed, and the renewal receipt was sent by the company to its agent, on October 12, 1870. The receipt as dated July 16, 1870, and was given to Day on the 14th of October, 1870. On the 22d day of January following, the insured, Day, died. It was contended by the insurance company that between the time of thus making and presenting his certificate to the agent and the date (14 days later) on which the agent delivered to him the receipt by which his insurance policy was continued in force until July 16, 1871, there had been a change in the health of the insured, and that the failure to make known such change of health was a fraud upon the company which invalidated the policy thus renewed or continued. It was also contended that the representations made on the 1st of October, concerning the condition of the health of the insured, was a continuing one from the time it was made until the delivery of the renewal receipt on the 14th of October, and that, if not true at the latter date, the contract was avoided. Justice Hunt, delivering the opinion of the Supreme Court of the United States, said:

"The facts referred to, we think, show that although actually completed on the 14th of October, the jury would have been warranted in finding that the contract was understood and intended by the parties to take effect by relation as of the 1st of the month. The money was paid to the agent at Washington on that day. The full amount of the premium for one year was paid by the applicant, viz., $137.50. The company cut off the insured from 2½ months of his policy when they issued it on the 1st of October, and dated it as of July 16th, although taking payment of the premium for a year. We think that they did not necessarily intend to cut off an additional 14 days, but may have meant it to be as of the date when the insured paid his money and presented a risk that they were willing to take, and of the time that it would have taken effect if they had responded without a delay of two weeks. Had it been otherwise, we cannot see how the sagacious business men who control this company would have assented to the delivery of the policy without inquiry as to the intermediate time. More than three months elapsed before Day's death, monthly returns being made by the agent; and the company must have known and assented to the delivery of the renewal receipt not only, but to the fact that there had been no inquiry or information as to Day's health after October 1st. The jury might account for it on the theory that the whole contract was intended to be and was as of October 1st, and that it spoke from that date. There is every indication that Day thus relied upon that contract, nor is there any reason to believe that he intended to deceive or to conceal. The company made inquiries to its own satisfaction, so far, in such direction, upon such points, and within such periods, as it thought proper. It was not for him to advise the company of what it should do, or to volunteer information which it did not seek. He paid his money, delivered his certificate, received the renewal when the company chose to give it, found upon examination that it covered the whole period from the July preceding. He lived in the same town with the agent, and received no suggestion from him that anything further was expected, and was warranted in assuming that his contract was intended to take effect from an earlier period than its actual delivery. He probably died in the honest belief that he had thus provided for his widow. It would be far from good faith to his representatives should it now be held otherwise."

We are of opinion that the insurance policies in this consolidated case took effect on March 16, 1911, and covered the entire period from that date up to the death of the insured, and that whatever change, if change there was, in the health and physical condition of the insured prior to the delivery of the policies to the insured on April 16, 1911, was a risk within the terms of the policies, and that the insurance company is liable on its contracts.

The judgment and decree of the lower court is affirmed.