10727

LIVINGSTON v. UNION CENTRAL LIFE INS. CO.

(112 S. E. 547)

1. STIPULATIONS—ADMISSION THAT INSURED WAS NOT GUILTY OF FRAUD IN MAKING FALSE ANSWER ADMITS HE DID NOT KNOW IT WAS FALSE. —An admission on the record by counsel for the defendant insurance company, that an applicant for insurance was not guilty of fraud in making a false answer to a question, is an admission that he was not conscious at the time he made the answer that it was false in fact.

2. APPEAL AND ERROR—FORMER RULING ON SUFFICIENCY OF EVIDENCE IS CONTROLLING WHERE SUBSEQUENT EVIDENCE DIFFERS ONLY IN QUANTITY.—A ruling by the Supreme Court on a former appeal, that the evidence was insufficient to show the false statement made by insured was material, justifies a directed verdict against the insurance company on a retrial, where the evidence as to the materiality of misrepresentation differed merely in quantity· and not in quality or character.

Before WHALEY, J., County Court, Richland, January, 1921.    Affirmed.

Action by Mrs. Mattie Caldwell Livingston against Union Central Life Insurance Co. From directed verdict for plaintiff the defendant appeals.

For former appeal in this case see·115 S. C., 118.

*Mr. R. B. Herbert,* for appellant, cites: *What is material fact in application for insurance*: 1 Mills Const. Rep., 154. *It was error to direct a verdict*: 1 Mills Const. Rep., 154. 3 Brew., 573; 4 McC. L., 511; 26 Cyc., 615; Joyce Ins., Sec. 3710-A. *Not necessary to plead fraud*; 111 S. C., 482; 241 U. S., 622; 117 U. S., 529; 3 Joyce Ins. (3d Ed.), Secs. 1897, 1892; 79 S. E., 809; 16 A. & E. Enc. L. (2nd Ed.), 933; 14 R. C. L., 1075; 83 S. C., 236; 4 McC. L. 511. *Tender did not come too late*: 107 S. C., 393; 102 S. C., 115; 113 S. C., 10.

NOTE: On effect of honest mistake in answer as to health of insured warranted by him to be true, see notes in 53 L. R. A., 193 and 15 L. R. A. (N. S.), 1277.

*Messrs. Lyles & Lyles,* for respondent, cite: *Fraud is a necessary element to avoid the policy:* 61 S. C., 338; 80 S. C., 392; 83 S. C., 236; 92 S. C., 45; 106 S. C., 419; 107 S. C., 21; 112 S. C., 139; 110 S. C., 384; 111 S. C., 399; 171 Pac., 621; 173 Pac., 841; 115 S. C., 113; 115 S. C., 182. *The tender came too late:* 56 S. C., 508; 61 S. C., 455; 107 N. E., 557; 92 N. E., 380; 88 S. C., 533; 111 S. C., 339. *Verdict is proper and should be sustained:* 93 S. C., 295; 93 S. C., 420. *Answers in application need not be literally true, if substantially true:* 50 S. E., 529. *"True" is synonym of "honest, sincere, not fraudulent":* 111 U. S. 342; 241 U. S., 613.

May 20, 1922.

The opinion of the Court was delivered by MR. JUSTICE WATTS.

This is an appeal from a directed verdict in favor of plaintiff by the trial Judge, County Court, Judge Whaley. His Honor directed a verdict on the ground of materiality, ruling that the evidence upon this trial differed merely in quantity and not in quality of character from that before the Supreme Court then, the opinion in which has since been filed. *Livingston v. Insurance Co.,* 115 S. C., 128, 104 S. E., 538. The exceptions are four in number, and respondent served notice that she would ask that the verdict be sustained on three additional grounds.

Counsel for appellant admitted on the record during the trial that he did not allege or charge in the evidence that Livingston was guilty of fraud. This was an admission that Livingston did not know, and was not conscious at the time he made the answers, that his answers were false in fact. In the court's ruling he eliminated any charge of fraud. The record expressly admitted that Livingston, in making answers, was not conscious of any falsity. Even if he had answered, as appellant now contends

that he should have answered, and the appellant had written the doctors, the appellant would not have received any further information that would have helped it, as an examination of the testimony of Drs. Gibbes, Taylor, and McIntosh will disclose. Livingston was examined at the request of his wife, and did not himself consult a physician.

His Honor could not have done otherwise under the case of *Livingston v. Union Central Life Insurance Co.*, 115 S. C., 128, 104 S. E., 538, than direct a verdict. He was correct in holding that the evidence in the case on the question of materiality differed only in quantity, not in quality of character, and, under the opinion by MR. JUSTICE GAGE, in the other case, the Court would stultify itself not to overrule the exceptions and affirm the judgment. There is no evidence that Livingston himself at any time consulted any physician.

Judgment affirmed.

MR. CHIEF JUSTICE GARY and MR. JUSTICE FRASER concur.

MR. JUSTICE COTHRAN dissents.

MR. JUSTICE FRASER: I concur with MR. JUSTICE WATTS. It seems to me that the plain meaning of the statement in the application, which is made a part of the policy, is that fraud alone should avoid the policy and there is no claim that either in allegation or proof is there a claim of fraud. The only thing to do therefore was to direct a verdict for the plaintiff.

MR. JUSTICE MARION (concurring) : Action was brought by the plaintiff as the beneficiary of a policy of insurance issued by defendant company, March 26, 1918, for $1,000, on the life of her husband, John F. Livingston, who died February 23, 1919. The appeal is from the judgment of the Richland County Court, upon verdict for the plaintiff directed by the trial Judge.

The defense set up in the answer was that the policy was invalid and void, in that the application of the insured,

forming a part of the policy contract, contained false answers to certain inquiries. But, as conceded by the appellant, "although it was charged that the answers were false and were misrepresentations of material facts, the defendant did not allege fraud or attempt to prove fraud."

The term "fraud," as used in that connection by appellant and as it will be used throughout this opinion, is understood to mean actual fraud, imputing bad faith and conscious deceit, as distinguished from constructive or legal fraud. The plaintiff moved the Court to direct a verdict in favor of the plaintiff upon three grounds, which will be stated and considered in the following order: First, because the erroneous answers, alleged to be material misrepresentations, were not material; second, because there is no allegation or evidence of fraud on the part of the insured in making alleged erroneous answers in the application and that in the absence of fraud such alleged misrepresentations constitute no defense; and, third, that the defendant company did not elect to rescind or tender the premium within a reasonable time.

The trial Judge based the direction of verdict upon the first ground, expressly predicting his conclusion upon the decision of this Court in *Livingston v. Insurance Company,* 115 S. C., 128, 104 S. E., 538, which was an action between the same parties involving a similar contract. In that case this Court said:

"But we are satisfied that there, is no testimony tending reasonably to prove. that the instant answer was material to the risk, and that a verdict ought to have been directed for the plaintiff."

As to the testimony upon the issue of materiality, the Court further says:

"The only testimony thereabout is that of the medical director, Dr. Muhlberg. He testified: 'If any applicant states that he has consulted a physician within five years,

our practice is to find out why he consulted a physician. That is all."

In the case at bar the additional testimony directed to this issue, as developed by the examination of defendant's witnesses, Dr. M. B. Heyward, Dr. William O. Paull, Dr. William Muhlberg, and Mr. F. G. Querry, tended to establish that, if insured's answer to a particular interrogatory in the application had been true and not false, an investigation would have been undertaken which would have led to a rejection of the applicant for insurance. The testimony referred to is fully reviewed and analyzed in the dissenting opinion of MR. JUSTICE COTHRAN. The testimony differs both in quantity and quality from that produced in the other case of *Livingston v. Insurance Co., supra.* The decision in that case, therefore, does not control the determination of the question here presented. I am clearly of the opinion that the testimony directed to the issue of the materiality of the alleged false representation was sufficient, in the case at bar, to warrant the submission of that issue to the jury.

Respondent, having served due notice of intention to ask that the judgment be affirmed upon the additional grounds urged in support of the motion to direct a verdict in the Court below, it becomes necessary to pass upon the contentions thus made. The second ground upon which that motion was based squarely presents the question whether the defendant is entitled to avoid the policy by reason of a material misrepresentation on the part of the insured, constituting a part of the contract, in the absence of actual fraud.

The first consideration is a clear understanding and sound construction of the terms of the contract itself. At the foot of the application the insured signed the following certificate:

"I hereby declare that my answers to the questions in part I and part II, which together constitute my applica-

tion to the Union Central Life Insurance Company for life insurance are complete and true, and I agree that they shall form a part of the contract issued by the said company on my life."

Part II of the application, containing report of the medical examiner, Dr. Heyward, was in the handwriting of Dr. Heyward, the signature only being that of the applicant, Mr. Livingston. The application contained a large number of questions with numerous subdivisions. Question 26 made inquiry as to whether the applicant had ever had symptoms of almost every disease that "flesh is heir to." Question 27 was: "Have you had any illness or have you consulted any physician in the last 5 years? Answer Yes or No." To this question the applicant answered "No."

In case the answer was "Yes," the applicant was asked to specify the illness, giving the month, year, duration, result, and the physician's name and address. It is upon the answer of the applicant to question 27 that defendant contests the validity of the policy. Section 20 of the contract is as follows:

"This policy, together with application, a copy of which is endorsed hereon or attached hereto, shall constitute and contain the insurance contract. All statements shall, in the absence of fraud, be deemed representations and not warranties. No such statement shall avoid this policy or be used in defense of a claim thereunder, unless it is contained in the written application, and unless a copy of such application is endorsed or attached to the policy when issued."

It thus appears, by the express terms of Section 20 of the contract quoted, that "all statements, shall, in the absence of fraud, be deemed representations and not warranties." The clear intendment of this provision was to make any statement contained in the application a mere representation and not a warranty, if there was no fraud. With fraud, a warranty; without fraud, a representation. Applicant was thus expressly invited to enter upon this contract with

the assurance that no statement made by him should be deemed a "warranty" in the absence of fraud. It is significant that even his certificate, to the effect that the answers given "are complete and true," does not in terms "warrant" or guarantee the completeness and truth thereof. In conformity with the provisions of Section 20 of the contract, the language used is: "I hereby declare." Since, in the law of insurance, all statements which are not express warranties are representations, the only possible effect of this provision would be to convert a representation fraudulently made into a technical warranty, entitling the insurer to void the policy for its breach, regardless of its materiality. Was the applicant, Livingston, bound at his peril so to construe and understand the language of the policy? The inquiry is to be answered in the light of certain fundamental principles of law. Thus, conditions providing for disabilities and working forfeitures are to receive, when the intent is doubtful, strict construction against those for whose benefit they are introduced.

"This rule, applicable to all contracts, has peculiar force in cases like the present, where the attempt is to seize upon words introduced as a safeguard against fraud, and make them available to defeat the claim of the assured on the theory of a technical forfeiture without fault." *Hoffman v. Aetna Fire Ins. Co.,* 32 N. Y. 405, 88 Am. Dec. 345,

Another principal of law, as well as of ethics, is that, where the language of a promisor may be understood in more senses than one, it is to be interpreted in the sense in which he had reason to suppose it was understood by the promisee. *Barlow v. Scott,* 24 N. Y., 40 *Hoffman v. Ins. Co., supra.* It is also a familiar rule of law that, if it be left in doubt, in view of the general tenor of the instrument and the relations of the contracting parties, whether given words were used in an enlarged or restricted sense, other things being equal, that construction should be adopted which is most beneficial to the promisee. Co. Lit., 183,

Bacon's Law Maxims, Reg. 3; *Doe v. Dixon* 9 East., 16; *Martin v. Stone,* 2 Cow. (N. Y.), 806.

"This rule has been very uniformly applied to conditions and provisos in policies of insurance, on the ground that, though they are inserted for the benefit of the underwriters, their office is to limit the force of the principal obligation. *Yeaton v. Fry,* 5 Cranch, 341; *Palmer v. Western Ins. Co.,* 1 Story, 364, 365; *Petty v. Royal Exchange Ins. Co.,* 1 Burr. 349." *Hoffman v. Ins. Co., supra:* 14 R. C. L., 926; *Sample v. Ins. Co.,* 46 S. C., 491, 24 S. E., 334, 47 R. L. A., 696, 56 Am. St. Rep., 701; *Powell v. Ins. Co.,* 97 S. C., 379, 81 S. E., 654; *Hartford Ins. Co. v. Unsell,* 114 U. S., 439, 12 Sup. Ct., 671, 36 L. Ed., 496; *Logan v. Prov. Life Assur. Soc.,* 57 Va., 384, 50 S. E., 529.

In the light of these principles, I think it clear that, in interpreting the provisions of this contract, the insured is entitled to the benefit of the rule of construction adopted by the Supreme Court of the United States in construing the policy involved in the case of *Moulor v. American Life Ins. Co.,* 111 U. S., 335, 4 Sup. Ct., 466, 28, L. Ed., 447, as follows:

"What was meant by 'true' and 'untrue' answers? In one sense, that only is true which is conformable to the actual state of things. In that sense, a statement is untrue which does not express things exactly as they are. But in another and broader sense, the word 'true,' is often used as a synonym of honest, sincere, not fraudulent."

So construing the provisions of the contract herein, we are of the opinion that the company required, "as a condition precedent" to valid contract nothing more than that the insured "would observe the utmost good faith towards it, and make full, direct and honest answers to all questions without evasion or fraud." Obviously, if the insured in the case at bar, by the terms of the contract fairly construed, was held to no other standard than that of good faith, it follows that a defense based upon the making of

untrue answers must of necessity charge and establish bad faith or actual fraud.

But meeting defendant's contention squarely upon the ground upon which it is rested, that the only effect of the said provisions of the policy was to make the answers of the applicant representations and not warranties, in the sense these terms are used and understood in the law of insurance, is defendant's position tenable?

"A warranty is a statement of the contract with reference to the conditions on which it is predicated, the truth of which is made a condition precedent to its validity; while a representation is a statement made as an inducement to a proposed contract of insurance and collateral to the contract." 25 Cyc., 798.

Defendant contends that false representation, if material, will avoid the policy, irrespective of whether there was conscious knowledge of such falsity or whether there was any intent to deceive; that the legal aspects of the case would not be different if Livingston's untrue answer to the question propounded was due to loss of memory, accident, or some other innocent cause, since the Court must look to the effect of the untrue statements upon the insurance company rather than the corrupt motive of the one making them; and that if Livingston obtained this policy by means of untrue statements, though ignorant of their falsity, he must be held responsible as for a legal fraud.

It must be conceded that, where contracting parties stand upon equal footing and have, or in the exercise of ordinary care may acquire, equal knowledge of the subject-matter of the contract and of the force and effect of the representations and stipulations which determine the respective rights and obligations of the parties thereunder, the rule contended for is sound, both in law and in ethics. It has been applied by the Courts of many jurisdictions to life insurance contracts. But I think there is well-grounded reason for the application of a somewhat different rule to

such contracts. As is said by a distinguished text-writer:
"* * * The subject of insurance is a highly technical one
and an intimate familiarity with it may fairly be imputed to
an agent engaged in the business, but not to the average
person dealing with him," etc.    Black on Rescission and
Cancellation, § 477; *McCarty v. Ins. Co.,* 81 S. C., 152; 62
S. E., 1, 18 L. R. A. (N. S.), 729.

It is a matter of common knowledge that the business of
insurance in its various branches is largely carried on by
strong corporate agencies, organized and, operated upon
the basis of expert knowledge of the nature of the risks
underwritten; that while insurance contracts, particularly
in the field of life insurance,  are usually "sold" by skilled
agents and not "bought" by the persons underwritten, the
terms and stipulations of the contract are fixed and prepared
by the insurers; and that, in all essential particulars of
form and substance, the contract speaks the language of the
insurer and not of the insured.; and that the ordinary
purchaser of a life insurance policy has neither the ability
to formulate or the capacity to understand the more or less
technical terms and conditions of the standardized forms of
contract which embody the mutual obligations of the parties.
Due in large measure to such considerations, insurance con-
tracts have quite generally become the subject of statutory
regulation. 14 R. C. L., p. 25. Thus in this State, by the
provisions of Section 2719 of the Civil Code of 1912, the
insurer is estopped, after the expiration of 60 days, from
denying the truth of the statement in an application for fire
insurance "except for fraud in making the application."
Section 2733 provides that life insurance companies receiv-
ing the premium upon "any policy for the space of two
years shall be deemed * * * to have waived any right they
may have had to dispute the truth of the application for
insurance, or that the assured person had made false rep-
resentations, and the said application and representations
shall be deemed and taken to be true."

Section 2723 authorizes life insurance companies "to institute proceedings on the ground of the falsity of the representations contained in the application" if commenced "within two years from the date of said policy." Section 2730 of the Code prohibits discrimination, etc., by any life insurance company and expressly provides:

"Nor shall any such company, or agent thereof, make any contract of insurance or agreement as to such contract other than as plainly expressed in the policy issued thereon."

In the light of the foregoing consideration, so pointedly recognized in the exercise of the legislative power of the State, I think there are salutary reasons, grounded in sound public policy, for not applying the rule that the erroneous or untrue but not fraudulent representation of a material fact by an application will avoid or forfeit a life insurance policy after a right of action has accrued thereon and the lips of one of the parties to the contract have been effectually sealed by death.

Proceeding next to the consideration of the proposition for which appellant contends, in the light of the decisions of this Court, I am of the opinion that the question has been substantially, if not expressly, decided against appellant's contention. In the early case of *Walton v. Bethune,* 2 Brev., 453, 4 Am. Dec., 597, the Court said:

"A warranty is to be strictly and literally complied with; a representation must be substantially complied with, or the policy may be avoided *on the ground of fraud.*" (Emphasis added.)

No exhaustive review of the decisions in this jurisdiction can be attempted. The cases of *Ingraham v. Ins. Co.,* 3 Brev., 522; *Money v. Union Ins. Co.,* 4 McCord, 511; *Himely v. S. C. Ins. Co.,* 1 Mill, Const. 154, 12 Am. Dec., 623, cited by appellant, were all marine insurance cases.

"Contracts of marine insurance are *uberrimea fidei* and are held to carry an implied warranty that both parties will disclose all facts material to the risk." 26 Cyc., 617.

In no case that has come to the writer's attention, in action upon a life insurance contract, has a defense based upon a misrepresentation of the insured been approved or sustained by this Court, except where the misrepresentation was alleged to be or was construed by the Court to amount to actual fraud. See *Drakeford v. Knights of Damon,* 61 S. C., 338; 39 S. E., 523; *Fludd v. Assurance Society,* 75 S. C., 315; 55 S. E., 762; *Hankinson v. Ins. Co.,* 80 S. C., 392; 61 S. E., 905; *Gambrill v. Ins. Co.,* 83 S. C., 236; 95 S. E., 231; *Gamble v. Ins. Co.,* 92 S. C., 451; 75 S. E., 788; 41 L. R. A. (N. S.), 1199; Id., 95 S. C., 200; 78 S. E., 875; *Huestess v. Ins. Co.,* 88 S. C., 33; 70 S. E., 403; *Baker v. Insurance Co.,* 106 S. C., 419; 91 S. E., 324; *Fowler v. Insurance Co.,* 107 S. C., 21; 91 S. C., 1043; *Wingo v. Insurance Co.,* 112 S. C., 139; 99 S. E., 436; *Floyd v. Insurance Co.,* 110 S. C., 384; 96 S. E., 912; *Johnson v. Insurance Co.,* 111 S. C., 399; 98 S. E., 140; *McLaurin v. Insurance Co.,* 115 S. C., 59; 104 S. E., 327; *Livingston v. Ins. Co.,* 115 S. C., 128; 104 S. E., 538. The case of *Gamble v. Ins. Co.,* 92 S. C., 451; 75 S. E., 788; 41 L. R. A. (N. S.), 1199, has been cited as tending to support the contention that a life policy may be avoided for a material misrepresentation innocently made by the appellant. Examination of the opinion of the Court will disclose that the decision was predicated upon the fact that the husband, the beneficiary, signed the application with his wife, the insured, and that he knew at the time of the making of the application that his wife had Bright's disease and an enlarged heart, a fact of which she was ignorant. The Court held that the husband could not have the benefit of his wife's lack of knowledge of her malady when it was "known to him," that he could not "be allowed to willfully conceal and then have the benefit of this concealment," etc. The answer in that case alleged fraud and the decision goes no further than to hold that the facts made an issue under the pleadings for the jury. On the second appeal in that

case (*Gamble v. Ins. Co.,* 95 S. C., 196; 78 S. E., 875), a judgment in favor of the plaintiff was affirmed. The concurring opinion by Mr. Chief Justice Gary contains the following:

"One of the provisions in the policy is that 'all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties.' Therefore, even if the statements contained in the application were not true, this fact alone was not sufficient to defeat the plaintiff's right of recovery. The burden of proof rested upon the defendant to prove, as alleged by it, that the policy of insurance was obtained by fraud, misrepresentation, and deceit, which unquestionably would render it null and void."

In the case of *Fowler v. Insurance Co., supra,* the defendant sought to avoid a life policy, upon the ground that the appellant had made false answers to certain questions as to the use of alcoholic liquors. The Court said:

"No question but that there was full proof that the company relied on Miles' answers in the application touching his use of liquor; but the real issue is, were such answers untrue, known to be so, and made to deceive the company?"

It is true that, in the Gamble and Fowler cases and in most of the other cases cited, fraud was expressly pleaded. In the case of *Hankinson v. Ins. Co., supra,* and *Wingo v. Ins. Co., supra,* while fraud does not seem to have been charged in terms, this Court held that the facts alleged amounted to fraud. Thus, in the Hankinson case where the Circuit Judge charged that it was incumbent upon defendant to prove fraud, this Court held there was no error, and said:

"The defendant had set up the defense of conscious failure of duty on the part of the plaintiff. * * * It is not necessary that a placard should be placed charging fraud when discussing fraudulent practices."

The case of *Gambrill v. Insurance Co.,* 83 S. C., 236; 65 S. E., 231, is not in point upon this question.   In that case the false statement was construed to be a technical warranty and not a 'representation, and its falsity, which assured knew or was presumed to have known, was held sufficient to avoid the policy.   But in the subsequent and very recent case of *Sligh v. Sovereign Camp, W. O. W.* (S. C.), 109; S. E., 279, where defendant sought to avoid a policy upon the ground of the falsity of the assured's statement that he had not had pleurisy and had not been examined by a physician within five years, which statements were expressly warranted to be true under penalty of avoiding the policy, this Court held that, in the absence of testimony tending to prove that the assured had knowledge of the falsity of his answers or should have had such knowledge, recovery could be had.   Even then, if it be conceded, as appellant contends, that the point at issue has not been expressly decided in previous adjudications of this Court, I think it is entirely clear that the Court has uniformly proceeded upon the assumption that proof of fraud on the part of an applicant for life insurance, in the making of an incorrect representation, is essential to the avoidance of the contract by the insurer after death of the insured.

While, as has been noted, that rule is not universally approved by the Courts of other jurisdictions, it seems to be supported by a formidable array, if not by the greater weight, of authority.   Thus, in Cooley, Vol. 3, Briefs on Law of Insurance, p. 1956 (f), it is said:

"The rule may indeed be regarded as well established that, to avoid a policy for misrepresentation, the false statement must have been made willfully and with intent to deceive, and must have been relied upon by the insurer."

Numerous cases from various jurisdictions are cited. In the recent supplement to Cooley's Briefs on the Law of Insurance, Vol. 6, p. 642, the rule is restated as follows:

"It is a general principle, subject, however, to some qualification, that to avoid a policy for misrepresentation, the false statement must have. been made willfully and with intent to deceive."

Among decisions cited as tending to sustain the general principle enunciated are the following: *Kettenbach v. Omaha Life Ass'n,* 49 Neb., 842; 69 N. W., 135; *Germania Ins. Co. v. Rudwig,* 80 Ky., 223; *Supreme Lodge Knights of Honor v. Dickson,* 102 Tenn., 255; 52 S. W., 862; *Hunter v. International Fraternal Alliance,* 7 Ohio Dec., 239; *Baltimore Life Ins. Co. v. Floyd,* 5 Boyce (Del.), 431; 94 Atl., 515; *Empire Life Ins. Co. v. Gee,* 178 Ala., 492; 60 South., 90; *Globe Mut. Life Ins. Ass'n. v. March,* 118 Ill. App., 261; *Raymer v. Modern Brotherhood,* 157 Ill. App., 510; *Metropolitan Life Ins. Co. v. Johnson,* 49 Ind. App., 233; 94 N. E., 785; *Pelican v. Mutual Life Ins. Co.,* 44 Mont., 277; 119 Pac., 778; *Bryant v. Modern Woodmen,* 86 Neb., 372; 125 N. W., 621; 27 L. R. A. (N. S.), 326; 21 Ann. Cas., 365; *Diehl v. Mutual Life Ins. Co.,* 76 Ill. App.; 462; *Feeney v. Nat. Council Knights & Ladies of Security,* 172 Ill. App., 51; *Nedved v. Court of Honor,* 183 Ill. App., 390; *Groffinger v. Metropolitan Life Ins. Co.,* 183 Ill. App., 618; *New York Life Ins. Co. v. Moats,* 207 Fed., 481; 125 C. C. A., 143; *Prudential Ins. Co. of America v. Sellers,* 54 Ind. App., 326; 102 N. E., 894; *Kasprzyk v. Metropolitan Life Ins. Co.,* 79 Misc. Rep., 263; 140 N. Y. Supp., 211; *Sharrer v. Ins. Co.,* 102 Kan., 650; 171 Pac., 622; *Logan v. Prov. Sav. L. Ass'n. Soc.,* 57 W. Va., 384; 50 S. E., 529; *Reserve, etc., Co. v. Isom* (Okl. Sup.) 173 Pac., 844; *Am. Nat. Ins. Co. v. Anderson* (Tex. Civ. App.), 179 S. W., 66; *American Bonding Co. v. Ballard, etc.,* 165 Ky., 63; 176 S. W., 368.

I apprehended that the distinction, expressly or impliedly made in many decisions, between representations as to matters of opinion on judgment and matters within the knowledge of the applicant, does not affect the validity of

the principle that the representation relied upon to avoid the policy must embody the element of fraud. The authorities that recognize that distinction and hold that a representation of a material matter within the knowledge of the applicant will avoid a policy, whereas the representation of a material fact which is a matter of opinion will not avoid the contract, would seem clearly to proceed upon the assumption that the false representation of a material fact, absolutely within the knowledge of the insured, involves of necessity bad faith or actual fraud. Thus, the case of *Mutual Ins. Co. v. Hilton Green*, 241 U. S., 613; 36 Sup. Ct., 676; 60 L. Ed., 1202, cited to sustain the rule contended for by appellant in the case at bar, was a case involving an application for life insurance, the statement of which the applicant "warranted to be true." The Court goes no further than to hold that a material incorrect statement warranted to be true, "nothing else appearing, *if known to be untrue by assured when made* [will] invalidate the policy without further proof of actual conscious design to defraud." (Italics added.)

Manifestly a false statement of that character knowingly made involves the element of actual fraud. It has, in effect, been so held by this Court. *Hankinson v. Ins. Co., supra*. In the case at bar the answer does not allege that the false statement of Livingston was "known to be untrue when made." On the contrary, upon the trial and in argument, it is expressly conceded that the untrue statement might have been due to "loss of memory, accident," or some other cause than fraud.

In the absence of allegation or proof of fraud on the part of Livingston in the making of the alleged false representation, which is relied upon to avoid the policy of insurance in the case at bar, the verdict for plaintiff was properly directed. That conclusion renders it unnecessary to consider the third ground upon which respondent seeks to sustain the judgment below.

For the reasons indicated, I concur in the result of the opinion of Mr. Justice Watts.

MR. JUSTICE COTHRAN (dissenting) : Action on a policy of life insurance, issued March 26, 1918, to John F. Livingston for $1,000, payable to his wife, the plaintiff. The insured died February 23, 1919, under an operation for duodenal ulcer. Suit was instituted June 9, 1919. The defendant denied liability upon the ground that the insured had, in his application for insurance, made an untrue answer to the question: "Have you had any illness or have you consulted any physician in the last five years?" The application is dated March 17, 1918, and contains a declaration that the answers to the question "are complete and true, and I agree that they shall form a part of the contract issued by said company on my life."

At the close of the testimony, the presiding Judge directed a verdict in favor of the plaintiff, for the amount of the policy with interest, upon the ground (the second of three) that the defendant had not shown that the subject of the alleged misrepresentation was material to the risk. The plaintiff based the motion upon two other grounds: (1) First, because there is no allegation or evidence of fraud on the part of the insured in making alleged erroneous answers in the application, and they constitute no defense; (3) third, and because it did not elect to rescind and tender back the premium within a reasonable time; and upon this appeal has given proper notice to sustain the judgment upon them, if necessary.

The party who moves for a directed verdict does so with the implied admission that every material fact in the adversary's testimony is true, and that every legitimate inference in his favor may be deduced therefrom. With this principle before us, let us examine the case as presented.

The evidence tended to establish the following facts:

On the 17th of March, 1918, John F. Livingston made written application for a policy of life insurance for

$1,000 in the defendant company. The application con-- sisted of two parts: Part 1 was the formal application for the policy, and contains nothing of interest to this con- troversy; part 2 contains the report of Dr. Heyward, the medical examiner of the company, and consists of a number of questions and answers relating to the applicant's family history, habits, and health, past and present. The only question and answer having immediate bearing upon this appeal is as follows:

"27. Have you had any illness or have you consulted any physician in the last five years? Answer 'Yes' or 'No.' No. (In case the answer was 'Yes' the applicant was asked to specify the illness, giving the month, year, duration, result, and the physician's name and address.)"

At the foot of the application the following certificate was signed by the applicant:

"I hereby declare that my answers to the question in part I and part II, which together constitute my application to the Union Central Life Insurance Company for life insurance, are complete and true, and I agree that they shall form a part of the contract issued by the said com- pany on my life."

The application was received and accepted by the com- pany, which issued its policy conformably with the applica- tion, dated March 26, 1918. The policy contained the following clause:

"20. Contract. This policy, together with the applica- tion, a copy of which is indorsed hereon or secured hereto, shall constitute and contain the entire contract. All state- ments shall, in the absence of fraud, be deemed represen- tations and not warranties. No such statement shall avoid this policy or be used in defense to a claim thereunder, unless it is contained in the written application, and unless a copy of such application is indorsed on or attached to the policy when issued."

The insured died within a year thereafter, on February 23, 1919, and the sole ground of defense against the action brought by the beneficiary, is that the answer to question 27, above set forth, was untrue, and necessarily so within the knowledge of the insured. The defendant disclaims all charge or suggestion of fraud on the part of Mr. Livingston, who is conceded to have been a man of the highest character; its position is that the foregoing representation was false, and that the subject-matter of it being material to the risk, such misrepresentation avoided the policy and relieved it of all liability.

It is conceded that, either in the year of 1914 or 1916, the insured had a serious spell of illness and was attended for a period of two weeks by three physicians. It is immaterial, in the conflict of the testimony, which is the correct date, as either would be within the five-year period referred to in question 27; but under the rule stated, we will accept as the true date that which is more favorable to the party against whom the verdict was directed, the year 1916. The circumstances of that illness and medical attention were as follows: Dr. McIntosh was called to see Mr. Livingston. He had been his family physician for 10 years. Mr. Livingston was subject to severe gastric attacks that were ascribed to an infected gall bladder; that was Dr. McIntosh's diagnosis. He advised that the gall bladder be removed and that a surgeon be called in; upon that advice Mr. Livingston went to see Dr. Taylor who made an examination and diagnosed the case as one of duodenal ulcer, infected gall bladder, or chronic appendicitis. Dr. Taylor advised an operation, but that an X-ray picture be taken before the operation. Dr. Gibbes took the pictures, which showed negative result. In preparing for the picture, Dr. Gibbes administered a large dose of bismuth, which relieved the pain, the symptoms disappeared, the patient was much better, and he (the patient) declined to consider the matter of operation further. At

the time that Dr. McIntosh was called in, Mr. Livingston "had one of those serious gastric attacks," vomiting a great deal of green bile; the acute attack lasted two or three days and it took many more days for him to get well. In the year 1911 Mr. Livingston had a severe attack of "multiple neuritis," lasting from June to October, crippling him so that he was in a rolling chair for a while, on crutches for a while, and walked with a stick for a number of weeks, during which attack he was attended by three doctors. Dr. McIntosh stated that "multiple neuritis" can follow an acute attack of duodenal ulcer, and that after the operation, which resulted in his death, developed the fact that he had a duodenal ulcer, the doctors knew that it was the cause of the attack of multiple neuritis in 1911. At the time of the examination in 1919, Dr. McIntosh gave to Dr. Taylor a history of Mr. Livingston's attacks; they consisted of nausea, vomiting, digestive disturbance, stomach trouble due, as he thought, to an infected gall bladder. Mr. Livingston also gave a history of periodic attacks extending back a long time; his mother stated that he had had those attacks for years. Dr. Taylor testified:

"In my opinion he had at that time, and I said so on that consultation, that he had an ulcer of the duodenum, that is, where the intestines join the stomach—or he had trouble with his gall bladder, or chronic appendicitis. * * * My opinion at the time was that he most probably had doudenal ulcer. That is the reason I sent him for the X-ray pictures."

The pictures showed negative, so far as an ulcer was concerned, but the doctor adds:

"Nevertheless, in view of Mr. Livingston's history, which at that time was very important, more valuable to us than the X-ray pictures, because in the X-ray pictures, we had not reached the degree of refinement in our work that we have now, and we could not tell as definitely in as large a

percentage of cases then as we can now of the presence of duodenal ulcer."

—that Mr. Livingston was relieved of the symptoms by the large amount of bismuth which was given to him; "it fills up the ulcer and the patient is relieved over good long periods, he got relief as a result of this"; that Mr. Livingston was so greatly relieved that he thought he was perfectly well, and jokingly referred to his escape from the surgeons, to which the doctor with prophetic ken replied: "Oh, you will fall into our hands later." When he did so, this is what the doctor swore: "When I operated on him in 1919, I found the condition I had suspected, and he did not survive the operation." The doctor does say that, after Mr. Livingston passed through that attack and appeared in such perfect health, he destroyed the records of his examination because he felt that they were mistaken in the diagnosis, and the records would be of no further use. The tragic result, however, unfortunately demonstrates the correctness of that diagnosis.

Mrs. Livingston, the plaintiff, testified in reference to her conversation with Dr. Taylor:

"He said, 'Mrs. Livingston, I think if I were in Mr. John's place I would go around to the hospital and let us make an incision and see if there is anything wrong with him. I want you to understand that we may go in and find malignant cancer or nothing at all; the pictures don't show anything.' * * * Off and on Mr. Livingston had some attacks with the stomach. On one occasion he had an attack that was so severe he was incapacitated for work for three or four months—I think it was possibly a couple of months before he went back to work. I could not say how many attacks he had subsequently to that. I don't think they were serious enough for me to remember them in detail."

These facts abundantly showed, or at least tended to show, which is sufficient in answer to the motion for a di-

8 S. C.—120.

rected verdict, that there was a misrepresentation on the part of the applicant. Upon the further issues of the materiality of the subject-matter of the misrepresentation, the evidence was of the following tenor:

Dr. Pauli, assistant medical director of the company, who passed upon the application of Mr. Livingston, testified:

"If an applicant states he consulted a physician within the past five years for an illness which lasted more than a few days, we require a statement from the physician who treated him, giving the diagnosis of the illness and the probable cause. Under the rules and customs of our company, if Mr. Livingston had disclosed that he consulted with Drs. McIntosh, Gibbes and Taylor, or with any of them within two years of his application, the application would not have been approved without further investigation. * * * Whenever there is any indication of any stomach disorder or indigestion or abdominal colic, we require the amendment form 1968 above referred to."

The form referred to was offered in evidence. It is a letter addressed to the agent of the company, signed by the medical director, instructing him to mail the form of a letter enclosed to the physician who is shown by the applicant's answer to question 27 to have attended the applicant. This letter, intended for the physician, recites that the applicant has stated in his application that the physician addressed had been consulted by him for treatment of an illness in a certain year, and calls upon the physician for a statement of the diagnosis of the illness and its probable cause, particularly enquiring: "Was there ever any suspicion or indication of appendicitis, ulcer of the stomach, etc?" The witness Dr. Pauli further states:

"We make free use of these amendments, as we regard the question, 'Have you had any illness or injury or have you consulted any physician in the last five years,' as of vital importance in deciding our action on an application. * * * We positively refuse to issue insurance to an ap-

plicant that has consulted a physician for any stomach dis-
orders, diagnosed as possible duodenal or gastric ulcer and
an operation recommended or suggested, until five years
have elapsed since complete recovery from the gastric symp-
toms and no recurrence of the symptoms. * * *. An
applicant who has had any signs of symptoms of gastric or
duodenal ulcer within the past five years is not eligible for
insurance in this company."

Dr. Muhlberg, the medical director of the company, testi-
fied:

"Cases giving a history of gastric ulcer are not accepted,
if there have been any attacks of gastric ulcer or any symp-
toms of gastric irritation within five years from the date of
the examination. * * * Gastric ulcer or duodenal ulcer
—a personal history of gastric or duodenal ulcer within the
past five years declines a risk. * * * Where an ap-
plicant states that he has consulted a physician within five
years for indigestion or gastric irritation, our practice, in a
case of this sort where any history is given within five years,
is to send to the attending physician form 1968. * * *
Our practice, where one states in his application that he has
consulted a physician and does not give the reasons for con-
sulting a physician, is to write back to find out why he con-
sulted a physician within the past five years."

Dr. Heyward, the local medical examiner of the company,
testified:

"I asked him the question, 'Have you had any illness or
have you consulted any physician in the last five years?' to
which he answered 'No.' If he had ever reported any exam-
ination I certainly would have made a note of it. The com-
pany requires it, and I carried out absolutely the instruc-
tions of the company. * * * If Mr. Livingston had re-
ported he had consulted a physician within five years, I
would have taken the name and address of the physician
and asked him what was the matter with him and sent the
name and address in to the company, together with what he

reported was the matter with him, and they would write the physician to find out the diseases under interpretation. The company don't issue the policy until they have looked into it carefully. If he had had one or more gastric attacks within the five-year period in which he was carried to a physician and an operation was suggested, I would consider that a serious condition, and, if I had reported such a condition. I do not think the company would have issued the policy without further investigation."

Mr. Querry, the agent who solicited the insurance, was put up as a witness for the plaintiff. He testified:

"If a man for whom I am trying to write insurance told me that within two years previous to the application he had been in consultation with two physicians, and, after examination, that one of those physicians had told him that he either had duodenal ulcer or gastric irritation or gall stones, one of these things, and that in his opinion an operation was necessary, and that after that time, X-ray pictures were taken which disclosed no duodenal ulcer, I would not have felt that I could write that policy, leaving my company in total ignorance of that condition.

"Q. Mr. Querry, when a man, in answer to that question as to whether or not he has consulted a physician within five years, if he reveals the fact that he has consulted a physician for gastric irritation, vomiting, soreness of the stomach, what is the custom of your company before you write a policy under those circumstances? A. I never bother with it at all.

"Q. You don't go any further? A. No, sir; the chances are it will never go through.

"Q. The chances are it will never go through? A. Well, our ruling is five years after the last attack they will consider it, otherwise they will not. * * * It is the rule of the Union Central Life Insurance Company, and my experience is that the rule is strictly adhered to through custom, that whenever an application for insurance discloses a

medical consultation within the five-year period; the company writes to the physician with whom the consultation was had and secures all facts, and, if a serious physical condition was disclosed at the time of said consultation, the policy is rejected. I think there can be no question that, if Mr. Livingston had disclosed a consultation with either Dr. McIntosh, Dr. Gibbes, or Dr. Taylor, the company would have ascertained all the facts concerning said consultation and why the consultation was had, and, if it had appeared that he was suffering with some stomach trouble and that an operation was advised by one or more of these physicians, the company would have rejected the policy."

This was the testimony as to the materiality of the subject of the representation, and as to the conclusion to be drawn from it, I do not see how there can be a doubt; certainly there was sufficient evidence of it to send the question to the jury. It is remarkable to note the very strong conviction that first seized the trial judge, forcibly and I think correctly stated by him, and his sudden veering to the opposite and erroneous conclusion. He stated:

"Now if the jury is ever—and the jury is a very component part of our Court and our system of jurisprudence —if a jury is ever to have a case, following our rule in this state, that where there are two reasonable inferences to be drawn it must go to the jury, if they don't get it in this case, where could there ever be a case in which they would get it? * * * They have come in here with testimony from those who pass upon the risks, who are there to protect the rights of the company, whatever those rights are, and there is testimony in here which goes to the crux of this matter that the company deems material, when a question like this, as to consultation was not answered so as to put them on notice so they could make further inquiry. * * * Now it is a serious proposition for a trial Court, in the light of a Supreme Court decision that had only certain facts before it to say that when additional facts come in

and from men in a department who are there for the special purpose of passing upon its materiality—in fact, of even checking up the agent very often—it is a very serious proposition for this Court to say that there is nothing at all from a reasonable standpoint to go to that jury, from the company's viewpoint, because I have to take it that there may be two viewpoints here; I have got to hold the balances as best I can, and I seriously think it is a question for you gentlemen to argue before the jury as to whether or not it would be considered material. Now, there is the company through its proper person saying it is material, and they are reasonable in saying that, with all of the evidence in this case, for there certainly is more not only in quantity but in quality. Now, then, it is for the jury to say whether those men representing the company say whether it is material and they would have refused that policy or whether they would not. It is a question of materiality. * * * That being so, I not only have more in quantity here, but more in quality, because they said that there wasn't testimony there showing how the company would have found out."

He then suddenly shifted, and, while admitting that the testimony upon this trial on the vital issue of materiality was "more in quantity and more in quality" than on the former trial, held to the assumption, practically, that the same testimony on this trial was before this Court on the former appeal; an assumption rebutted by his own conclusion and by the statement of counsel to which no dissent was entered by the opposing side. As a matter of fact, the record of the former trial was not before him, and had absolutely no place in the discussion. The decision of this Court upon the former appeal was not before him except as to the principles of law announced therein. In the trial of this case, it cannot possibly be ascertained, in the present state of the record, what facts were before the Court in the former appeal. If we should follow the remarks of

the trial Judge, we must conclude that the testimony was greater in quantity and stronger in quality than on the trial of the other case.  If we should follow the undisputed statement of counsel for defendant, we must conclude that the testimony of Dr. Muhlberg, that it was the custom of the company to write to the attending physician for a statement of the illness of the applicant, was before the Court on this trial and not on the first; that the same is true of the testimony of Dr. Pauli and Mr. Querry; that the forms were in evidence at this trial and not at the first; the same as to Dr. Heyward's testimony.

The leading opinion states that the trial Judge ruled that the evidence upon this trial differed merely in quantity and not in quality or character from that before the Court upon the former trial.  As a matter of fact, he ruled directly to the contrary: "There certainly is more not only in quantity but in quality; that being so, I not only have more in quantity here, but more in quality."  He does say: "I simply have accumulative testimony here"; which in view of the former statement carries little weight.

But assume that the leading opinion is correct in its interpretation of the trial Judge's construction of the evidence in the two trials, and also that that construction is correct, to my mind it is a most illogical conclusion to hold that, because the defendant in the former case did not have enough testimony upon the issue of the materiality of Livingston's representations to escape a directed verdict, it must suffer the same fate in this case, for the reason that its testimony differed only in quantity, the element in which it was deficient before.

But compare the testimony at this trial with the meager statement of it in the opinion in the first case, and it will be seen that the testimony upon this trial supplied the very deficiency upon which the Court directed a verdict for the plaintiff on the former appeal.

I admit that I do not apprehend the difference between the excerpt from Dr. Muhlberg's testimony, set forth in the former opinion at page 191, and the statement of the Court as to what the defendant should have proved. That excerpt is this:

"If any applicant states that he has consulted a physician within five years, our practice is to find out why he consulted a physician."

The opinion declares:

"It (the company) was bound to offer testimony tending to prove that, in the instant case, had it known of the consultation, it would have found out the reason of the consultation."

My mind does not grasp the distinction between finding out why he consulted a physician, and finding out the reason of the consultation. Perhaps it was intended to declare that, instead of testifying to the practice of the company, he should have testified what would have been done in this particular contingency. If that be true, noting that the opinion declares that the testimony of Dr. Muhlberg was the only testimony on that point, the deficiency is fully supplied by the testimony of Dr. Pauli upon this trial:

"If Mr. Livingston had disclosed that he consulted with Drs. McIntosh, Gibbes and Taylor, or with any of them within two years of his application, the application would not have been approved without further investigation" —by the testimony of Dr. Muhlberg; by the testimony of Dr. Heyward, quoted above, and the testimony of Mr. Querry, witness for the plaintiff, also quoted above.

The opinion in the former case further declares: "The witness did not say how he would find out." This deficiency is also fully supplied by the ample testimony of the four witnesses, named above, starting with the agent who took the application (quoted above) detailing with exhibit of the forms used, the practice of calling upon the attending physician;

"Will you kindly state your diagnosis of the illness for which you treated him and also submit the additional information requested, in order that final action can be taken upon this application?"

The leading opinion declares:

"Counsel for appellant admitted on the record, during the trial, that he did not allege or charge in the evidence that Livingston was guilty of fraud. This was an admission that Livingston did not know and was not conscious at the time he made the answers, that his answers were false in fact."

This is clearly a *non sequitur;* it does not necessarily follow that, because Livingston may have known of the falsity of the representation, he was guilty of fraud, that is, of a purpose to deceive; his knowledge and his freedom from fraud are therefore entirely compatible with each other; and hence the admission of his freedom from fraud cannot be said to eliminate his knowledge of the falsity of the representation. However innocent and free from imputation of fraud he may have been in stating that he had not been attended by a physician in the last five years, that freedom from fraud cannot have the effect of rendering him unconscious of the fact. As this Court has said in *Gambrill v. Ins. Co.,* 83 S. C., 236; 65 S. E., 231:

"The statement which the assured warranted to be true was that he had not had medical or surgical treatment within the past five years, and he knew, or is presumed to know, that this statement was false."

The leading opinion further declares:

"Even if he had answered, as appellant now contends he should have answered, and the appellant had written the doctors, the appellant would not have received any further information that would have helped it, as an examination of the testimony of Drs. Gibbes, Taylor and McIntosh will disclose."

It is not a question of what information the company would have received from the doctors, or whether that information would have helped it or not. Under the terms of the contract the company had the right to a truthful answer to this question, and they did not get it. It was as to a matter clearly within the range of information necessary to its decision to accept or reject the risk. An insurance company is not like a common carrier, legally bound to serve all who may apply; it is not legally obligated to issue the policy; it was a matter of convention between it and the applicant; and it had the right to insist upon truthful answers to questions upon a matter within the knowledge of the applicant and reasonably required as the basis of its action. But, aside from this, would the company have received helpful information upon application to the doctors, if Mr. Livingston had truthfully answered the question?

From Dr. Taylor alone, the intimate friend of the insured, the company would have received information which would unquestionably have caused it either to decline the application or conduct an independent examination of its own. Guided by his testimony in this case, Dr. Taylor would have written:

"In 1916 Mr. Livingston came to me for an operation, after Dr. McIntosh and I had seen him together and had been in consultation. He had been having attacks for some time, marked by nausea, vomiting, stomach disturbances and pain in the upper abdomen. Dr. McIntosh was of the opinion that he had a gall bladder infection. Mr. Livingston gave a history of periodic attacks, extending back a long time. His mother stated that he had had these attacks for years. At that time in the development of the profession, the most valuable criterion for the determination of the presence of a duodenal ulcer was the history of the patient, next in importance came the X-ray pictures.

We stripped him to the waist, laid him on the table and examined his abdomen. Based upon his history, the examinations and what Dr. McIntosh said, I announced at that consultation that he had an ulcer of the duodenum, or trouble with his gall bladder or chronic appendicitis. The symptoms of these diseases are similar; I thought that most probably he had a duodenal ulcer. Before operating we sent Mr. Livingston to Dr. Gibbes for an X-ray picture; he reported the result negative. The process of taking these pictures had not reached a reliable state and I regard his history as more valuable. Before taking the picture Dr. Gibbes administered a large dose of bismuth, which relieved the symptoms at once. Bismuth acts like soda, fills the ulcer and relieves the patient for a long period. Mr. Livingston apparently made a full recovery and stated that he was perfectly well. I told him that he would fall into the hands of the surgeon later. I destroyed the records because I felt that we were mistaken in our diagnosis."

Can there be any doubt but that with this information before it, the company would either have declined the application or insisted upon an examination of its own?

But that is not all. Dr. McIntosh would have written:

"I have been Mr. Livingston's family physician for 13 years. He was subject to severe gastric attacks which I ascribed to an infected gall bladder. I advised a surgical operation; went to see Dr. Taylor, who concurred in my diagnosis. There was no suggestion or suspicion of duodenal ulcer (disagreeing with Dr. Taylor); pictures were advised; Dr. Gibbes gave Mr. Livingston a large bismuth meal before photographing; the result of the picture was negative, the bismuth relieved the symptoms, and Mr. Livingston thereafter refused to submit to an operation; he appeared after that to have fully recovered."

Here we have two distinguished professional men, one a surgeon and the other a physician, with conflicting

opinions as to the cause of the serious attacks suffered by the applicant for many years, but both agreeing that the ailment was an exceedingly serious one, calling for surgical relief.

If the company chose to take the risk after the receipt of this information, upon the assurance of the doctors that the applicant had apparently fully recovered, all well and good; but that was a matter for it to decide, upon receipt of information to which it was entitled under the contract. This Court has no right to assume that the company would so have acted, when that information was denied to it by the misrepresentations of the assured, upon the ground that the information "would not have helped it."

There is testimony tending to show that the application, under these circumstances, would not simply have been suspended for further information, but that it would not have been entertained at all, would have been instantly rejected.

Dr. Pauli testified:

"We positively refuse to issue insurance to an applicant that has consulted a physician for any stomach disorder, diagnosed as possible duodenal or gastric ulcer and an operation recommended or suggested, until five years have elapsed since the complete recovery from the gastric symptoms and no recurrence of the symptoms. * * * An applicant who has any signs or symptoms of gastric or duodenal ulcer within the past five years is not eligible for insurance in this company."

Dr. Muhlberg testified:

"Cases, giving a history of gastric ulcer, are not accepted, if there have been any attacks of gastric ulcer or any symptoms of gastric irritation within five years from the date of the examination. * * * Gastric ulcer or duodenal ulcer—a personal history of gastric or duodenal ulcer within the past five years, declines a risk."

Mr. Querry, the agent, and a witness for the plaintiff, testified that, under the circumstances of this case, he would not even have forwarded the application (see extract from his testimony above), and that if forwarded it would have been rejected by the company.

Under this testimony I do not see how it is possible to hold that there was absolutely no testimony upon the point that the misrepresentation was of a fact material to the risk, a conclusion essential to the correctness of the directed verdict.

The aftermath is interesting, but of course not conclusive, of the question at issue. The assured had a recurrence of the attacks that had at intervals distracted him for so long a time, in February, 1919. The same doctors were called in; the delayed operation was performed and disclosed a duodenal ulcer, a confirmation of Dr. Taylor's diagnosis precisely of less than three years before. "When I operated on him in 1919 I found the condition I had suspected, and he did not survive the operation." Can it be said, as a matter of law, that, if the applicant had answered the question truthfully, and Dr. Taylor upon application had stated to the company that he examined Mr. Livingston in 1916 and suspected duodenal ulcer, the company would have issued the policy? In the letter which the company would have sent to Dr. Taylor he would have been asked for "the diagnosis and probable cause of the illness." A statement of the "suspected cause" more narrowly limits the field of unknown causes, more nearly approaches a definite opinion of the cause, than a statement of the "probable cause." The company was entitled to know the probable cause of the illness; it would have received from Dr. Taylor more definite information in his statement of the suspected cause.

Not only this; Dr. McIntosh testified that, in 1911, Mr. Livingston had an attack of neuritis which prostrated him,

put him in a rolling chair, on crutches, and with a stick, for four months; that multiple neuritis is a probable or possible result of duodenal ulcer; that when the operation of 1919 was had and the duodenal ulcer was discovered "we knew why he had this attack of multiple neuritis in 1911."

The attack of 1911 and the recurrent gastric attacks up to 1916 were the history of the patient upon which Dr. Taylor diagnosed the case as duodenal ulcer, in greater reliance than on the pictures. If he had been called upon for information as to the treatment in 1916, which the company had a right to call for, he would frankly have given not only his diagnosis as duodenal ulcer, but a history of the multiple neuritis attack of 1911, upon which and its connection with duodenal ulcer, his diagnosis was based. With this information, can it be said as a matter of law that the company "would not have been helped, but would nevertheless have issued the policy?"

The policy provides that the statements made by the applicant shall, in the absence of fraud, be deemed representations and not warranties. This is a concession in favor of the policyholder, for it is greatly to the advantage of the company that they be deemed warranties and not representations simply; the main distinction being that a statement deemed a warranty need not be shown to have been material to the risk, while the converse is true, if it be deemed simply a representation.

Considered then as a representation, what were the legal rights of the company in connection with a truthful answer to the question? The question was: "Have you had any illness or have you consulted any physician in the last five years? Answer "Yes" or "No." (In case the answer was "Yes" the applicant was asked to specify the illness, giving the month, year, duration, result and the physician's name and address.) The applicant answered "No," and

certified not only that his answer was "complete and true," but that it should form a part of the contract issued by the company on his life.

Upon the issue of materiality, it is not necessary that the matter misrepresented contributed in some way or degree to the loss for which indemnity is claimed; the determining factor is whether the answer would have influenced the company in deciding for itself, and in its own interest, the important questions of accepting or rejecting the risk. *Lewis v. Ins. Co.,* 201 Mo. App., 48; 209 S. W., 630.

That the company is entitled to a truthful answer and to the information which it will lead up to; and that such a representation is material to the risk and if false avoids the policy to the same extent as if it had been an express warranty, is supported by both reason and authority. 25 Cyc. 801; 3 Joyce Ins. § 1882 et seq.; 2 Cooley's Briefs, 1166; *Metropolitan Life Ins. Co. v. Brubaker,* 78 Kan., 146; 96 Pac., 62; 18 L. R. A. (N. S.), 362; 130 Am. St. Rep., 356; 16 Ann. Cas., 267; 3 Cooley's Briefs on Law of Insurance, p. 2156a; *Rigby v. Metropolitan Life Ins. Co.,* 240 Pa., 332; 87 Atl., 428; *Owen v. Metropolitan Life Ins. Co.,* 74 N. J. Law, 770; 67 Atl., 25; 122 Am. St. Rep., 413; *Bryant v. Mod. Woodmen,* 86 Neb., 372; 125 N. W., 621; 27 L. R. A. (N. S.), 330; 21 Ann. Cas., 365; *Schwartzbach v. Ohio Val. Protective Union,* 25 W. Va., 622; 52 Am. Rep., 227; *Kasprzyk v. Metropolitan Life Ins. Co.,* 79 Misc. Rep., 263; 140 N. Y. Supp., 211; *Trav. Ins. Co. v. Lumpkin,* 5 Colo. App., 177; 38 Pac., 335; 3 Cooley's Brief on Law of Insurance, pp. 1953c, 1959; *Mattson v. Mod. Samaritans,* 91 Minn., 434; 98 N. W., 330.

In *Germania Ins. Co. v. Klein,* 25 Colo. App., 326; 137 Pac., 73, it is said:

"In our opinion no inquiry was made in the instant case, or can be made, more material to the risk and more essential to properly advise the company contemplating or con-

sidering the issuance of a policy, and which would more probably influence it in determining whether it would enter into the contract, than the question as to whether the applicant had consulted a physician, or what physician she had consulted. It is in evidence that this answer was relied on by the company in approving the application. If the applicant had truthfully answered that she had consulted and been treated by Dr. Lefcowitch, inquiry could have been made of him, and it will be presumed that the company would have been informed that he had diagnosed her case as carcinoma of the liver and had so treated it, and there is little reason to doubt that such information would have so influenced the defendant in this case that it would have declined the application."

"But if he had consulted a physician, or been treated by one, during that time, the defendant had the right to know it, by whom and what for, so that it might ascertain the particulars from him." *Aloe v. Mutual Ass'n.,* 147 Mo., 561, 49 S. W., 553; *Society v. O'Hara,* 120 Pa., 256, 13 Atl., 932; *McCollum v. Ins. Co.,* 124 N. Y., 642; 27 N. E., 412; *Cobb v. Ben. Ass'n.,* 153 Mass., 176, 26 N. E., 230, 10 L. R. A., 666; 25 Am. St. Rep., 619; *Ins. Co. v. Mc-Tague,* 49 N. J. Law, 587, 9 Atl., 766, 60 Am. Rep., 661; *Cummings v. Ins. Co.,* 89 Me. 37, 35 Atl., 1032; *Mengel v. Ins. Co.,* 176 Pa., 280, 35 Atl., 197.

In *Ins. Co. v. McTague,* 49 N. J. Law, 587; 9 Atl., 766; 60 Am. Rep., 661, it is said:

"That representation did not aver a condition of health, or that it was requisite or proper to consult a physician. It averred that he had not consulted a physician or been prescribed for by a physician. The fact found contradicted this averment, whether the consultation and prescription related to a real disease or an apprehension of disease. Indeed, so material does such a representation seem to be to the contract proposed by the application that in my judg-

ment, if made falsely and knowingly, it would avoid the
contract."

In *Mutual Co. v. Hurni,* 260 Fed., 641, 171 C. C. A., 405,
quoting from the syllabus, it is declared:

"A statement by an applicant for life insurance that he
had not consulted nor been treated by a physician during
the previous five years, when in fact he had been treated
or prescribed for each year for supposedly temporary ail-
ments, held a material misrepresentation, which, under the
terms of his contract, invalidated the policy."

The application, as it was presented to the company for
acceptance, with an untruthful answer to this material
question, disclosed a most favorable insurance risk. The
company acted upon it as it was. There is abundant evi-
dence, tending at least to show that, if it had been other-
wise, and in conformity with the facts, the application
would not have been immediately accepted as it was, but
would have been suspended for further information or de-
clined altogether. Has the assured the right to stand upon
a contract which was consummated upon the faith of the
company in the truthfulness of a misrepresentation which
is conceded to have been as a matter of fact untrue?

The respondent, however, contends that the direction of
a verdict was proper, for the reason that there is neither
"Allegation nor evidence of fraud on the part of the in-
sured in making alleged erroneous answers in the applica-
tion, and they constituted no defense." I assume that the
proposition intended to be advanced is that irrespective of
the materiality of a misrepresentation, it will be no defense
against liability under the policy, unless such misrepresen-
tation was accompanied by a fraudulent intent upon the
part of the assured; that there can be no such defense as
an innocent misrepresentation of a material fact. I am
content to base my opinion, in opposition to this proposi-
tion, upon the case of *Mutual Life Ins. Co. v. Hilton-*

9 S. C.—120.

*Green,* 241 U. S., 613, 36 Sup. Ct., 676, 60 L. Ed., 1202, where it is said:

"Considered in most favorable light possible, the above-quoted incorrect statements in the application are material representations; and, nothing else appearing, if known to be untrue by assured when made, invalidate the policy without further proof of actual conscious design to defraud," and upon the following cases which sustain the principle: *Momer v. American Life Ins. Co.,* 111 U. S., 335, 345, 4 Sup. Ct., 466, 28 L. Ed., 447, 450; *Phoenix Mut. Life Ins. Co. v. Raddin,* 121 U. S., 183, 189, 7 Sup. Ct., 500, 30 L. Ed., 644, 646; *Aetna Life Ins. Co. v. Moore,* 231 U. S., 543, 556, 557, 34 Sup. Ct., 186, 58 L. Ed., 356, 365, 366; May, Ins. (4th Ed.), § 181; 16 Am. and English Ency. of Law (2nd Ed.), p. 933; 14 Ruling Case Law, p. 1025; Joyce on Insurance (2nd Ed.), 3 vol. §1897; *Gardner v. North State Mutual Life Ins. Co.,* 163 N. C., 367, 79 S. E., 809, 49 L. R. A. (N. S.), 714, Ann. Cas., 1915B, 652; *New York Life Insurance Company v. Fletcher,* 117 U. S., 529; 6 Sup. Ct., 837; 29 L. Ed., 934.

In the case cited from 241 U. S., 613, 36 Sup. Ct., 676, 60 L. Ed., 1202, the lower Court had held:

"That, in order for the company successfully to defend upon the ground of false statements, there must have been material, and made by Wiggins (the assured) with knowledge of their falsity and with a fraudulent purpose, that is, with intent to deceive."

It was in answer to this proposition that the Court announced the principle above quoted.

No South Carolina case has been cited in support of the proposition and I have not found one. In the Gambrill case it is held that the applicant is presumed to have known of his sickness and the attendance of a physician, and in *Drakeford v. Knights of Damon,* 61 S. C., 338, 39 S. E., 523 (cited by the respondent) it is held:

"If the deceased made misstatements and concealed facts in order to induce the company to enter into the contract, we cannot conceive how any other inference could be drawn than that it was a fraud upon the rights of the defendant."

See, also, 3 Joyce, § 2003; *Metropolitan Co. v. Brubaker,* 78 Kan., 146, 96 Pac., 62, 18 L. R. A. (N. S.), 326, 13 Am. St. Rep., 356, 16 Ann. Cas., 267; *Cobb v. Ins. Co.,* 153 Mass., 176, 26 N. E., 230, 10 L. R. A., 66, 25 Am. St. Rep., 619.

In reference to the suggestion of the respondent that the company has lost the right to interpose the defense which has been discussed, by its laxness in not tendering a return of the premiums paid in due season, a neglect in this particular has been held to warrant a submission of the waiver to the jury, but it extends no further.

In view of the request of the appellant that the Court review the decision in the former appeal between these parties in another suit, 115 S. C., 128, 104 S. E., 538, which I think should be granted, I am impelled to advert to a most strained and I think erroneous construction of a certain stipulation in the policy, which presents the limit of microscopic criticism.

The stipulation referred to is as follows:

"All statements shall, in the absence of fraud, be deemed representations and not warranties. No such statement shall avoid this policy or be used in defense to a claim thereunder, unless it is contained in the written application, and unless a copy of such application is endorsed on or attached to the policy when issued."

The opinion declares:

"The converse of the latter clause of that stipulation is that statements contained in the application shall avoid the policy. But there is no sense in such a stipulation: it is without meaning, and it must be read out of the contract.

If the Company meant to say that false statements in the application by the applicant should avoid the policy, it has not said so by expression or by necessary implication; it has said nothing like that."

By every reasonable intendment, the provision could only apply to statements which might be effective as a defense and was intended to limit them to such as were contained in the written application. It was for the protection of the policyholder, so that a false representation not contained in the application might not be used against him. To imply that any statement, true or false, contained in the application, might be used to avoid the policy, is to read into the stipulation not only what the parties could not have intended, but a rank absurdity.

My conclusion is not only that there was abundant evidence tending to establish the misrepresentation of a fact material to the issue, truthful information as to which was contracted for by the applicant's stipulation, but that no other reasonable inference can be drawn from the testimony. The verdict should if moved for have been directed in favor of the defendant.